FEB 1 1 2016

CLERK U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

PAULA HANSON-HODGE,                              )
                                                 )
                          Plaintiff,             )
                                                 )
v.                                               )        Civil Action No. 1:14-cv-744
                                                 )
CAROLYN COLVIN, IN HER OFFICIAL                  )
CAPACITY AS ACTING COMMISSION OF THE             )
SOCIAL SECURITY ADMINISTRATION,                  )
                                                 )
                          Defendant.             )
                                                 )

## MEMORANDUM OPINION

This matter comes before the Court on Defendant Carolyn Colvin's Motion for Summary

Judgment. Dkt. No. 60. This controversy arises out of an employment relationship between pro

se Plaintiff Paula Hanson-Hodge and Defendant Carolyn Colvin, in her official capacity as the

acting Commissioner of the Social Security Administration ("SSA"). Hanson-Hodge claims the

SSA retaliated against her, in violation of Title VII of the Civil Rights Act of 1964, after she

filed a complaint with the Equal Employment Opportunity Commission ("EEOC"). As

explained below, the Court finds good cause to grant the Motion for Summary Judgment.

## I. Background

### A. The Performance Assessment and Communication System

This case involves SSA's execution of the Performance Assessment and Communication

System ("PACS"). Accordingly, some background information on PACS is necessary.

PACS, as outlined in SSA's Personnel Policy Manual, is a system SSA uses for

evaluating personnel performance and dealing with employees who are not performing

adequately. Def. Ex. 2. Under PACS, when an employee's performance is identified as

1

marginal or failing, the employee's supervisor should place the employee on a Performance Assistance Plan ("PAP"). *Id.* When initiating a PAP, the supervisor must discuss the performance issues with the employee. *Id.* at 15. After this discussion, an employee will be given 30 calendar days, which the supervisor may extend, to improve performance. *Id.* If "the employee's performance has not improved or is below the Successful Contribution Level" at the end of this "Performance Assistance period," the supervisor should initiate an Opportunity to Perform Successfully ("OPS") plan. *Id.* at 15-16. When an OPS plan is initiated, the supervisor must communicate what aspects of performance are unacceptable and what additional assistance will be provided to the employee to help improve performance. *Id.* at 16. An OPS plan typically lasts for 120 days, but may be shortened or extended. *Id.* During this period, the supervisor must engage in ongoing discussions with the employee about progress towards improvement. *Id.*

If an employee is on a PAP or an OPS plan, he or she is ineligible to participate in the "Flexiplace" program, a program under which employees could work at home one or two days a week. Def. Ex. 4, at 4-5.

## B. The Productivity Standard

Plaintiff was an analyst in the SSA Office of Appellate Operations ("OAO") with the SSA's Office of Disability Review and Adjudication ("ODAR"). Am. Compl., at 14. Plaintiff, in her position as an analyst at the ODAR, evaluated requests for review of decisions made by administrative law judges. Hanson-Hodge Depo. at 52-53. After analyzing the case file, Plaintiff would make a recommendation on the claim to an administrative appeals judge or officer assigned to the case. *Id.*; Def. Ex. 5, at 2-3. The administrative appeals judge or officer would then consider the case and either accept or reject the recommendation. If rejected, Plaintiff would have an opportunity to revise and resubmit her recommendation.

Sometime prior to October of 2007, the SSA adopted a new productivity standard for all analysts. Hanson-Hodge Depo., at 81-84. SSA made this productivity standard one of the critical elements of an analyst's performance evaluation. Def. Ex. 5, at 2-3. Under the new productivity standard, Plaintiff was expected to complete a "fair share" of assigned cases, defined as completing between 70% and 130% based on a weighted scale. *Id.* at 3. Each type of case an analyst in ODAR might work on was "assigned a time value, representing the average time needed to process the average case of that type." *Id.* at 5. For example, a "request for review denial" was assigned a time value of 3.5 hours because the average analyst could process such a case in 3.5 hours. *Id.* At the end of each month, the time value of each case Plaintiff completed was added up to yield an "aggregate time value." *Id.* This aggregate time value was then "divided by the number of hours the analyst spent in the casework during the reporting month." *Id.* "The resulting figure, expressed as a percentage, represents the production rate for the reporting month." *Id.*

ODAR used an electronic system called the Appeals Review Processing System ("ARPS") to manage and track the cases ODAR received, worked on, and completed. Gerald Ray Depo., at 8-9. ARPS, among other things, keeps track of what cases an analyst has been assigned, the recommendations an analyst has given, and the cases an analyst had been credited with completing. *Id.* The ARPS system credits an analyst with completing a case when an administrative law judge or appeals officer has signed off on the final decision in the case. *Id.* at 48; Hanson-Hodge Depo. at 90.

### C. History of Plaintiff's Employment at the SSA

In October of 2003, the SSA hired Plaintiff as a hearing and appeals analyst in the OAO. Am. Compl., at 14; Def. Ex. 1, Hanson-Hodge Depo., at 51-52. In July of 2005, SAA sent Plaintiff on a detail to the Medicare Subsidy Appeals unit. Hanson-Hodge Depo., at 65-66. While on that detail, Plaintiff was physically assaulted by another employee, Vicki Renner. *Id.*

3

at 68-73. Following this incident, Plaintiff submitted a complaint to the EEOC. *Id.* at 73-75. This complaint was eventually settled in 2008. *Id.*

In December of 2006, Plaintiff was in a car crash which left her temporarily unable to work. *Id.* at 76-77. While recovering from this accident, in April of 2007, Plaintiff began to work from home. *Id.* at 78-79. In October of 2007 Plaintiff returned to work. *Id.* at 77. When Plaintiff returned to work in October of 2007, she discovered that ODAR had adopted the new productivity standard discussed above. *Id.* at 81-84.

In February of 2009, Plaintiff's supervisor, Evelyn Gregory, placed Plaintiff on a PAP and removed her from the Flexiplace program. In placing her on a PAP, Gregory noted that Plaintiff's productivity ratings for the previous months had been below the 70% threshold. In response, Plaintiff filed an EEO complaint alleging that the PAP and her subsequent removal from the Flexiplace program were retaliation for her prior EEO complaint based on the assault. Plaintiff claimed that her productivity was below 70% because Gregory had not been properly crediting her with completed cases. Plaintiff chose to submit this claim to arbitration and the arbitrator eventually decided against her. Plaintiff did not appeal this decision and thus did not exhaust her administrative remedies as to this claim. Accordingly, these events cannot form the basis of a claim in the current action.[1]

Gregory placed Hanson-Hodge on performance plans several more times. Am. Compl., Dkt. No. 26, at 8-9. On September 18, 2009, Gregory placed Plaintiff on a second PAP. *Id.* Then, on May 21, 2010, Gregory placed Plaintiff on a third PAP. *Id.* Finally, on October 21, 2010, Gregory placed Plaintiff on an OPS plan because she had failed to improve her

---

[1] Plaintiff included the February 2009 PAP in her initial Complaint. Dkt. No. 1. This Court dismissed the initial Complaint and instructed Plaintiff to omit all reference to these events because Plaintiff had not exhausted her administrative remedies as to this claim. Dkt. No. 25. Plaintiff, accordingly, did not include the February 2009 PAP in her Amended Complaint, but the Court includes them here so as to paint a full picture of the events leading up to the alleged retaliatory action in this case.

performance during the course of the May 2010 PAP. *Id.* In October of 2010, Plaintiff

submitted a request to participate in the Flexiplace program; Gregory denied this request because

Plaintiff was still on the May 2010 PAP. Def. Ex. 14.

In the documentation of the initiation of all three performance plans, Gregory cited

Plaintiff's failure to meet the 70% performance threshold. In the memorandum initiating the

September 2009 PAP, Gregory cited Plaintiff's productivity for the months of May 2009 through

August 2009 as follows:

| | |
|---|---|
| May 2009 | 42.66% |
| June 2009 | 35.69% |
| July 2009 | 47.86% |
| August 2009 | 20.34% |

Am. Compl. Exs., Dkt. 26-1, at 42. In the memorandum initiating the May 21, 2010, PAP,

Gregory cited Plaintiff's productivity for the months of January 2010 through April 2010 as

follows:

| | |
|---|---|
| January 2010 | 35.60% |
| February 2010 | 58.44% |
| March 2010 | 61.10% |
| April 2010 | 35.09% |

Def. Ex. 11, at 4. In the memorandum initiating the October 21, 2010, OPS plan, Gregory cited

the three PAPs Plaintiff had been placed on and Plaintiff's failure to improve her performance

during the third PAP. Def. Ex. 13. Specifically, during the May 21, 2010, PAP, Plaintiff's

productivity was reported as follows:

| | |
|---|---|
| June 2010 | 33.52% |
| July 2010 | 34.51% |
| August 2010 | 21.96% |
| September 2010 | 51.15% |

*Id.*

Significantly, Gregory retired in December of 2010, two months after she placed Plaintiff on an OPS plan.[2] There is no documentation of Gregory terminating Plaintiff's OPS plan prior to her retirement. Aff. Roxie Rasey Nicoll, Dkt. No. 66-1, ¶ 6. After Gregory retired, over a year and a half passed before any other action was taken in regards to Plaintiff's performance. On June 17, 2012, Roxie Rasey Nicoll became Plaintiff's first line supervisor. *Id.* ¶ 3. At that time, Nicoll discovered that Plaintiff's "productivity was very low" and that technically she was still on the OPS plan initiated by Gregory in 2010. *Id.* ¶¶ 5, 14. Plaintiff had worked under two supervisors between the time Gregory retired and Nicoll took over, but it appears neither of them addressed Plaintiff's productivity or her OPS plan. *Id.* ¶¶ 9-11. "[I]n an abundance of caution," Nicoll officially rescinded Plaintiff's PAPs and the OPS plan still in effect on October 1, 2012, in order to give "Plaintiff a clean start with regard to her performance under a new first line supervisor." *Id.* ¶ 14; Pl. Ex. E.[3]

### D. The Current Complaint

After the October 2010 events, Plaintiff filed another EEO complaint, alleging that Gregory was retaliating against her for filing an EEO complaint in 2005 by placing her on the PAP in May of 2010 and the OPS plan and by denying her request to participate in the Flexiplace program. Am. Compl. Ex. 1, Dkt. 26-1. On April 25, 2014, the SSA issued its Final Agency Decision on this complaint, in which it found that these actions did not constitute retaliation against Plaintiff. *Id.* After being issued a right to sue, Plaintiff filed her Complaint in this Court, claiming violations of Title VII of the Civil Rights Act of 1964.

In her Complaint, Plaintiff maintains that Gregory manufactured poor performance evaluations in furtherance of her retaliations. Plaintiff insists that throughout fiscal years 2009

---

[2] Neither party has been able to contact Gregory. Thus, neither party has taken her deposition or gathered any documents from her.
[3] Plaintiff continued to work for the SSA until she was terminated in January of 2014. Am. Compl., Dkt. at 20.

and 2010 she was meeting and exceeding the 70% productivity standard. Plaintiff claims that

Gregory was "stealing" case credits from her. Am. Compl., at 13-14. Due to this "stealing,"

Plaintiff claims she was not credited with all the cases she completed and as a result her

productivity was reported as below the 70% threshold on the monthly reports used to assess her

performance. *Id.* at 13-17. Plaintiff argues that Gregory was able to steal cases from her because

Gregory did not use the proper system—ARPS—to count and calculate Plaintiff's productivity

percentages in her monthly branch report. *Id.* Rather, Plaintiff says Gregory created her

monthly branch reports in Excel, which allowed her to report that Plaintiff completed fewer

cases than she actually did. *Id.* Gregory used these monthly branch reports as the basis for

placing Plaintiff on the PAPs and the OPS plan. *Id.* Inexplicably, during discovery, which

ended on November 13, 2015, Plaintiff did not file a motion to compel the production of these

monthly branch reports. Pl. Resp. Opp. Sum. J., Dkt. No. 64, at 7. Defendant, if she has them,

has not voluntarily produced the reports, so they are not currently before the Court.[4]

Plaintiff also claims that Gregory retaliated against her by harassing her. Am. Compl., at

13-15. Plaintiff describes this harassment as Gregory calling her into her office every week to

accuse Plaintiff of not completing enough cases. *Id.* Plaintiff says the harassment began to

occur "around the time of the EEO proceedings concerning the 2005 physical assault and around

the time Evelyn Gregory requested and received a copy of the settlement agreement with

Plaintiff and SSA, dated October 2008." *Id.*

---

[4] On January 8, 2016, Plaintiff filed a Memorandum of Subpoena for the Services of Mr. Gerald Ray to Identify and Produce Redacted ARPS Disposition Listings, Recommendation Listings and Signed by Adjudicators (Judges and Appeals Officers) Dispositions Completed by Paula Hanson-Hodge under her SSA PIN; and to Compare those ARPS lists with Evelyn Gregory's Monthly Reports Done in Excel. Dkt. 65. Judge Buchanan construed this filing as a motion for issuance of subpoena and denied the motion as discovery closed on November 13, 2016. Dkt. No. 68.

After the initial Complaint was filed, the Defendant filed a motion to dismiss, which this Court granted. Dkt. No. 25. Shortly thereafter, Plaintiff filed an Amended Complaint. Dkt. No. 26. Defendant then filed a motion to dismiss or in the alternative for summary judgment. Dkt. No. 27. The Court denied this motion so that discovery could be conducted. Dkt. No. 34. Discovery closed on November 13, 2015, and the case was set for trial on February 29, 2016. On December 18, 2015, Defendant filed the current motion for summary judgment. The motion has been fully briefed and is ripe for review.

## II. Legal Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). As the Supreme Court has explained, "this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A dispute over an issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Finally, in making a summary judgment determination, the Court must bear in mind that "[a] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

### III. Discussion

To establish a prima facie case of retaliation under Title VII[5], a plaintiff must demonstrate "[1] that he engaged in a protected activity, [2] that the employer took an adverse action against him, and [3] that a causal relationship existed between his protected activity and the employer's adverse action." *Baqir v. Principi*, 434 F.3d 733, 747 (4th Cir. 2006) (citing *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004)). The burden then shifts to the employer to establish a nonretaliatory reason for its action. *Id.* If the defendant does so, the plaintiff then "must show that the employer's proffered reason is pretextual." *Id.* "To show pretext, the plaintiff must show that the defendant's reason is 'unworthy of credence' or offer other forms of circumstantial evidence demonstrating retaliation." *Perry v. Peters*, 341 F. App'x 856, 858 (4th Cir. 2009) (citing *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004)).

Plaintiff claims that she engaged in protected activity when she filed an EEO complaint in 2005. Plaintiff then claims that because of this protected activity, her supervisor, Gregory, retaliated against her by placing her on a PAP and then an OPS plan in 2010 and by denying her request to participate in the Flexiplace program in 2010. Defendant maintains that she had a legitimate, nonretaliatory reason for taking these actions: Plaintiff was performing poorly as demonstrated by her failure to meet the 70% productivity standard many months in a row. The parties do not dispute that Plaintiff engaged in protected activity when she filed an EEO complaint in 2005. The parties do dispute whether Plaintiff has satisfied the second and third elements of her prima facie retaliation claim. The parties also dispute whether there is a legitimate nonretaliatory reason for Defendant's adverse action.

---

[5] Although Title VII does not explicitly provide federal employees with a cause of action for retaliation, the Fourth Circuit has permitted plaintiffs to make such claims. *See Baqir v. Principi*, 434 F.3d 733, 747 (4th Cir. 2006).

As explained below, the Court finds that Plaintiff has not established the third element of a prima facie case of retaliation. The Court also finds that Defendant has established that she had a legitimate, nonretaliatory reason for placing Plaintiff on a PAP and an OPS plan. In addition, the Court finds that Plaintiff has failed to show this reason is pretextual. The Court need not address whether Plaintiff has established the second element of a prima facie case of retaliation and declines to do so now.

### A. Whether a Causal Relationship Existed Between Plaintiff's Protected Activity and the Adverse Action

The third element of a prima facie case of retaliation requires the Plaintiff to prove that "the protect activity was causally connected to the adverse action." *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007). The Fourth Circuit has explained that a causal connection exists when the Defendant took the adverse action "*because* the plaintiff engaged in a protected activity." *Id.* (quoting *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998)). The Fourth Circuit "has held that evidence that the allegedly adverse action occurred *shortly* after the employer became aware of the protected activity is sufficient to 'satisf[y] the less onerous burden of making a prima facie case of causa[tion].'" *Dowe*, 145 F.3d at 657 (quoting *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989)). At the same time, the Fourth Circuit has also held that "[a] lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action . . . negates any inference that a causal connection exists between the two." *Id.* (holding that three years between when the employer became aware of the protected activity and the adverse employment action was too long to establish a causal connection); *see also Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as

10

sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close[.]").

"In cases where temporal proximity between protected activity and allegedly retaliatory conduct is missing, courts may look to the intervening period for other evidence of retaliatory animus." *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007) (quotations omitted). That is, a plaintiff can establish causation by presenting evidence of recurring retaliatory animus during the intervening period. *Id.*

Defendant argues that Plaintiff cannot rely on the temporal proximity to show a causal connection. The protected activity, filing the EEO complaint, occurred in 2005. Gregory apparently became aware of this activity shortly thereafter. The adverse action Plaintiff complains of, being placed on a PAP and an OPS plan, did not occur until 2010. This five year span between when Gregory became aware of the protected activity and the alleged adverse action is far too long to show a causal connection alone.

Plaintiff, in response, argues that Gregory continued to retaliate against her in the intervening period specifically by stealing her case credits.[6] Pl. Opp. Memo., Dkt. 64, at 20-23. As discussed at length in the following section, there is no evidence that Gregory was stealing case credits from Plaintiff. In addition, there is no evidence, beyond Plaintiff's blanket claims, that Gregory continually harassed Plaintiff during the five year intervening period. Plaintiff's Amended Complaint alleges that Gregory "aggressively call[ed] Plaintiff into her office every week to harass Plaintiff," and "to accuse . . . Plaintiff of not completing enough cases." Am. Compl., at 14. However, Plaintiff has not provided specific examples of harassing statements, documentation of the harassment, or any other evidence in support of these claims. Consistent

---

[6] Plaintiff does not directly argue that being placed on PAPs in February 2009 or September 2009 constitutes evidence of recurring retaliatory animus. However, because Plaintiff alleges she was placed on the multiple PAPs because Gregory stole her case credits, the Court could construe Plaintiff's memorandum as including this argument.

with PACS, a supervisor, such as Gregory, should engage in ongoing discussions about improvement with employees whose performance has been identified as marginal or failing. Gregory had identified that Plaintiff was not performing adequately, so it was appropriate for Gregory to meet with Plaintiff frequently to discuss her performance. Plaintiff has not presented evidence that Gregory was actually harassing her as opposed to engaging her in discussions about improving her performance and productivity.

Plaintiff claims that "Gregory started to steal the case credits during the proceedings of the 2005 EEO activity." Am. Compl., Dkt. 26 at 27. Though Plaintiff did not give a specific date, this would have to have occurred after October of 2007, when Plaintiff returned to work after the automobile accident, because the productivity standard was implemented while Plaintiff was on leave recovering from this accident. Thus, Plaintiff does not assert that she suffered any retaliatory acts for about two years, from 2005—when the EEO complaint was filed and Gregory became aware of this fact—until at least October of 2007. Plaintiff does maintain that for the next three years—from about October of 2007 until she retired in December of 2010—Gregory stole case credits from her and engaged in a pattern of harassment. However, as discussed above, Plaintiff has not presented evidence that Gregory stole case credits from her or harassed her. Thus, the Court concludes that Plaintiff has not established that there was recurring retaliatory animus during the intervening five year period. As this is far too long of a time period to establish a causal relationship alone, the Court concludes that Plaintiff has not established the third element of a prima facie case of retaliation. Accordingly, the Court finds that Plaintiff has failed to meet her burden in this case.

*C. Whether the Defendant has Establish a Nonretaliatory
Reason for its Action and Whether this Reason is Pretextual*

If a plaintiff establishes a prima facie case of retaliation, the burden then shifts to the

employer to establish a nonretaliatory reason for its action. *Baqir v. Principi*, 434 F.3d 733, 747

(4th Cir. 2006) (citing *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004)). If the defendant

does so, the plaintiff then "must show that the employer's proffered reason is pretextual." *Id.*

"To show pretext, the plaintiff must show that the defendant's reason is 'unworthy of credence'

or offer other forms of circumstantial evidence demonstrating retaliation." *Perry v. Peters*, 341

F. App'x 856, 858 (4th Cir. 2009) (citing *Price*, 380 F.3d 209, 212 (4th Cir. 2004)).

Defendant argues that it had a legitimate, non-retaliatory reason for placing Plaintiff on a

PAP and an OPS plan: Plaintiff repeatedly failed to meet the 70% productivity threshold.

Defendant offered evidence that demonstrates that Plaintiff failed to meet the 70% productivity

threshold in fiscal years 2009 and 2010. Defendant presented the affidavit of Joseph DeLuca, a

program analyst at the SSA who is familiar with ARPS, in support of her position. Def. Ex. 12.

DeLuca "queried the ARPS database for all cases assigned at any time to Paula Hanson-Hodge

during" FY 2009 and FY 2010. *Id.* According to this query, in FY 2009, Plaintiff "completed

172 recommendations in cases assigned to her." Of these recommendations, 169 "were released

in FY 2009 by OAO after a decision by an administrative appeals judges or appeals officer." *Id.*

Plaintiff also "receive[d] credit in FY 2010 for the additional recommendations made in FY 2009

that were closed in FY 2010." *Id.* In FY 2010 Plaintiff "completed 194 recommendations, of

which 181 were released by OAO after a decision by an administrative appeals judges or appeals

officer." *Id.* Plaintiff received credit in FY 2011 for 8 of the recommendations she made in FY

2010 that were not released until FY 2011. *Id.* However, 5 of these cases that were closed in

2011 were ultimately reassigned to another analyst. *Id.*

13

DeLuca's affidavit also describes how the productivity and attendance reports used by the Branch Chief to assess an employee's performance are created. *Id.* The number of cases an analyst is credited with completing are extracted from ARPS and entered into the report form. *Id.* The analyst's reported work time is also extracted from the "time and attendance reports" completed by each analyst and entered into the report form. *Id.* Using the productivity standard formula, the productivity report outputs each analyst's month productivity percentage and a cumulative year end productivity percentage. *Id.* Productivity reports for Plaintiff for FY 2009 and FY 2010 are included in DeLuca's affidavit. *Id.* The reports reveal that Plaintiff's cumulative productivity for FY 2009 was 43.8% and for FY 2010 was 41.58%.[7] *Id.* With these reports and DeLuca's affidavit, Defendant has firmly established that it had a legitimate, nonretaliatory reason for placing Plaintiff on a PAP and an OPS plan.

Plaintiff makes several arguments that Defendant's proffered reason is pretextual. Plaintiff primarily argues the Defendant's reason is unworthy of credence because Gregory was using an Excel spreadsheet rather than ARPS to calculate her productivity and create her monthly productivity reports. By using Excel, rather than ARPS, Plaintiff maintains that Gregory was able to steal case credits from her.

Plaintiff seems to misunderstand how the productivity reports are created for all analysts. As Defendant makes clear, ARPS itself does not create a productivity report. As explained above, in order to create a productivity report, the Branch Chief had to extract numbers from ARPS and an analyst's time sheet and plug those numbers into an Excel or Excel-like form. This form then calculates an analyst's productivity, presumably using an algorithm. Thus, Plaintiff's

---

[7] The "total number of cases" included on these reports is slightly higher than reported in Deluca's affidavit. The cumulative report for FY 2009 states that Plaintiff was credited with completing 173 cases (as opposed to 169 cases). The cumulative report for FY 2010 states that Plaintiff was credited with completing 183 cases (as opposed to 181 cases).

argument that Gregory's calculations of her productivity should be discredited because she did not use ARPS is inapposite.

Plaintiff has also failed to present evidence that Gregory's monthly reports incorrectly calculated her productivity or do not match the productivity report included in DeLuca's affidavit. Though Plaintiff had ample time during discovery, Plaintiff did not try to obtain the supposedly incorrect monthly reports created by Gregory during fiscal years 2009 and 2010. Plaintiff repeatedly attempts to fault the Defendant for not presenting these reports. This argument is misguided as it is Plaintiff's burden to present evidence to establish her case. Plaintiff cannot now build her case on documents that she made no effort to obtain until it was too late.

From the evidence presented to the Court, there is no question that the productivity reports included in DeLuca's affidavit—which clearly demonstrate Plaintiff's failure to meet the 70% threshold—are accurate. These reports use the numbers from DeLuca's fresh inquiry of ARPS into how many cases Plaintiff was credited with completing during FY 2009 and FY 2010. DeLuca testified that ARPS could not be manipulated so as to "steal" case credits from one analyst and give them to another. Def. Ex. 12. DeLuca explained that "ARPS . . . records any reassignment of a case from one user to another user," and that "ARPS system records such assignments in its metadata, which cannot be erased or changed by Branch Chiefs." *Id.* Plaintiff does not combat this evidence with any affidavits or depositions of her own. While Plaintiff contends that cases were not credited to her, her memorandum fails to clearly and specifically identify any case that was not properly credited to her on the ARPS report provided by DeLuca. The evidence in the record thus shows that Gregory was unable to manipulate case credits within

15

the ARPS system and that DeLuca's fresh ARPS inquiry accurately reflects the number of cases

Plaintiff completed during FY 2009 and FY 2010.

Plaintiff also argues that the 70% threshold is not a legitimate standard. Plaintiff argues

that it is illegitimate because there is no documentation that the commissioner of the SSA ever

approved the standard.

This argument is unavailing. Plaintiff has presented no evidence that the commissioner

of the SSA must approve this type of performance review standard for it to be legitimate.

Further, while Plaintiff may not like or agree with the performance standard adopted by ODAR,

this Court cannot "sit as a kind of super-personnel department weighing the prudence of

employment decisions made by firms charged with employment discrimination . . . ."

*DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (*Giannopoulos v. Brach & Brock*

*Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997)). Thus, when an employer articulates a

reason for taking disciplinary action against an employee that is not forbidden by law, "it is not

[the Court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so

long as it truly was the reason for the [employer's action]." *Id.* (quoting *Giannopoulos*, 109 F.3d

at 410-11). Defendant has articulated a lawful reason for placing Plaintiff on a PAP and an OPS

plan. This Court cannot now weigh in on whether the 70% threshold is a wise or prudent

standard to impose upon Plaintiff or other similarly situated analysts.

Defendant has clearly and firmly established that it has a legitimate, nonretaliatory reason

for placing Plaintiff on a PAP and an OPS plan. Plaintiff has failed to present any evidence or to

raise a question of material fact as to whether this reason is pretextual or otherwise unworthy of

credence. Accordingly, granting the Motion for Summary Judgment is appropriate here.

## IV. Conclusion

As explained above, the Court finds good cause to grant the Motion for Summary Judgment. Plaintiff has failed to establish her prima facie case because she has not established a causal connection between the protected activity and the adverse action. Notwithstanding the prima facie case, Defendant has met her burden of establishing a legitimate and nonretaliatory reason for placing Plaintiff on a PAP and an OPS plan: Plaintiff's productivity fell far below the minimum standard and there is ample evidence to support this conclusion. Plaintiff has not combatted this reason by establishing it is pretext for retaliation. Because Plaintiff has completely failed to prove essential elements of her case, summary judgment is appropriate.

Just prior to the issuance of this Memorandum Opinion, Plaintiff filed a Motion to Reconsider this Court's January 20, 2016 Order granting summary judgment in favor of Defendant. (Dkt. No. 70). Plaintiff also filed an Amended Motion to Reconsider (Dkt. No. 74) and Defendant filed a Memorandum in Opposition to the Motion (Dkt. No. 73). The Court has considered Plaintiff's Motion both as a motion to reconsider an interlocutory order, which is governed by Federal Rule of Civil Procedure 54(b), and as a motion to alter or amend a judgment, which is governed by rule 59(e). The analysis is essentially the same because in both iterations of the motion, the Court considered whether there was an intervening change in controlling law, whether new evidence was presented that was not previously available, or whether there was a clear error of law or a manifest injustice. *See Pac. Ins. Co. v. Am. Nat. Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998); *Evans v. Trinity Indus., Inc.*, __ F. Supp. 3d __, 2015 WL 8331944, at *1 (E.D. Va. Nov. 25, 2015) (quoting *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514–15 (4th Cir.2003)). As none of these grounds are present, the Court finds good cause to deny the Motion to Reconsider.

The Court has considered the new exhibits Plaintiff included in her filings. The Court concludes that these exhibits are not newly discovered evidence; rather, they are evidence Plaintiff had in her possession, but previously chose not to use. In addition, these new exhibits present no new information. They are consistent with the information before the Court when the Court granted summary judgment in favor of Defendant. Accordingly, the Court ORDERS that the Motion to Reconsider is DENIED.

/s/

Liam O'Grady
United States District Judge

February 11, 2016
Alexandria, VA

18